## 25227. BRUNSON *v.* THE STATE.

DECIDED JUNE 17, 1936.

*Branch & Howard, E. L. Tiller,* for plaintiff in error.
*Claude C. Smith, solicitor-general,* contra.

MacIntyre, J.   George Brunson, George Gray and Frank Miller were jointly indicted for "possessing burglary tools" on March 4, 1935, in violation of Code of 1933, § 26-2701.   Having been tried separately and convicted, Brunson filed his motion for new trial on the usual general grounds.   This motion was amended by adding numerous special grounds.   Error is assigned on the judgment overruling the motion for new trial as amended.

Mr. C. A. Winslett, who lived near Snap Finger Creek in De-Kalb County, found, on Tuesday morning, February 5, 1935, two prestolite tanks and an oxygen tank buried in the woods near his home.   Winslett reported his find to the DeKalb County police officers, who found that said tanks had been freshly buried in the ground and were partially covered with leaves.   The officers carried the tanks to Decatur, and then carried them back and reburied them where they had been found.   On' Wednesday morning, February 6, 1935, the officers found buried six inches below the surface of the ground, and about fifty feet from where the tanks were located, a garbage can containing "a bunch of rubber hose, gauges, a burning-torch and a package of tools containing a screw-driver . . two or three punches . . and a few other tools." After keeping constant watch, at about six o'clock Friday evening the officers saw two automobiles approaching along the road near which the articles mentioned were found.   One car stopped at the edge of the road, and the second automobile backed up to within about fifty feet of said articles and stopped, headed towards the road.   A man got out of the second car, pulled off his coat and threw it in the car, and began looking around in the woods with a flashlight.   Another man appeared with a flashlight.   The officers could see the two men moving about, and heard noises as if something were being placed in the automobile.   Then some one "gave an order," and some one said "all right," and the Studebaker automobile standing at the edge of the road started off. Just as the starter of the other car, an Oldsmobile, buzzed, the officers riddled it with buckshot and bullets.   No one was then arrested, and no occupant of either automobile was then identified. Shortly thereafter, the officers stopped and questioned the two occupants of an automobile traveling in the opposite direction from which the Studebaker automobile was going when last seen and

allowed them to proceed. In the meantime, another automobile driven by a Mr. McElroy was stopped by the officers. After being questioned and detained a while, Mr. McElroy was released. Shortly after the first automobile was allowed to proceed, the chief of police and other officers drove up. They pursued the first automobile and overtook it about two miles from the place where it had been first stopped. George Gray and Frank Miller were in this automobile, a Studebaker. The defendant, George Brunson, was not with them. The following are some of the articles found in the car occupied by Gray and Miller: a tow-rope, some wire, a pair of rubber gloves, some heavy insulated telephone wire, a six-foot rule, a "strip of composite packing," four monkey wrenches, one Stillson wrench, one machinist's hammer, a screw-driver, two files, three punches, a lock and key, a pair of pliers, a sheet of oilcloth about thirty-three inches wide and ten feet long, a "ten-gauge L. C. Smith shotgun," a flashlight, road-maps of North Carolina, South Carolina, Georgia and Florida, a pair of overalls with what appeared to be a bottle of sulphur in the pocket, a pocketknife, a pair of "wire snips," another flashlight, a pair of "goggles" with amber-colored lens, a box of ten-gauge shotgun shells loaded with "very large shot," and an "overall jumper" containing a key that fitted said two small prestolite tanks. Miller and Gray each had a pistol holster under his coat. Among the articles found in the Oldsmobile were: "this large tank and at least one of the smaller ones," certain tools which had been in the garbage can found buried in the ground near where the tanks were found, "a rigging of some kind with a blow torch on the end," two lines of pipe, two sets of gauges, a window cord, a sheet of oilcloth, a kit of tools, a sponge, a "pair of snips," a monkey wrench, a punch, a small screw-driver, two files, a number of nozzles apparently for the blow torch, a candle, a face mask, "wrecking-bars," a sledge hammer, a spade, a pair of overalls, a pinch-bar, twelve-gauge shotgun shells loaded with buckshot, a pair of cloth work gloves, several rolls of picture wire, adhesive tape, a safetypin on a string, a pocketbook containing "forty-five calibre machine-gun bullets" capable of being used in an automatic pistol or revolver, a gray coat, a hat and two caps. Two pistols and certain other articles were found along the road traveled by the automobile in which Gray and Miller were found, one pistol being a

forty-four and the other a thirty-eight. Later in the evening of the day on which Miller and Gray were arrested, Brunson was arrested on a truck with a young man named McCullough, whom Brunson had hired to bring him to Atlanta.

In his statement to the jury Brunson said that he had been in Atlanta only about six days; that he was engaged in the liquor business with a friend he had met in Florida; that he and his friend had procured seventy-two gallons of whisky and were trying to bring it to Atlanta by "side roads" when they saw "some flashlights down across a bridge;" that his friend said, "That's the law," and slammed on the brakes, and he, Brunson, jumped out of the car; that about this time he thought he heard some shots, and ran down in the woods towards the creek; that he did not know what became of his friend, and, being unfamiliar with the country, wandered around and went to a farm house and offered to pay some one to carry him to Atlanta, but could not get any one to take him; that he went to another farm house and was told by a gentleman that he could get some one to take him to Atlanta; that he had left the last house about forty-five minutes, and was sitting on a truck "waiting for the man to come back to take" him to town when he was arrested; that he had no connection with "the shooting business," or with the Studebaker automobile, or the Oldsmobile, or any burglar tools; and that he never said anything to Mr. McCullough about any shotgun or overcoat.

Mrs. Lula Ergle gave testimony from which the jury could have concluded that on the day before the shooting took place, she saw George Brunson, George Gray and Frank Miller in an automobile near the place where the articles hereinbefore described were secreted. Mrs. W. E. Thompson testified in effect that about fifteen or twenty minutes after the shooting a man ran up on her back-door steps and said the sheriff was after him, and asked "if there was anybody there that could drive a car," and she said there was not. This witness identified a man in the court-room as the one who came to her house, and, so far as can be told from the record, this man was the defendant Brunson. W. Cliff Smith, who lived about a quarter of a mile from Mrs. Thompson, testified in effect that on the night in question a man came to his house and said he "had run afoul of some officers and . . jumped off a load of liquor," and offered to pay witness $20 to get him somewhere.

L. R. McCullough testified in effect that when the defendant came to his house shortly after the shooting, he told witness that he had thrown a shotgun and an overcoat away near a brush pile near witness's home, and that he could have them if he would get them. Both shotgun and overcoat were found, the latter with recently-made dog tracks on it. Near the coat were found three shells loaded with buckshot. Some track dogs were put on a track near the Ergle home, and apparently followed Brunson for some distance. The coat was found about six hundred yards from where the tanks were found buried. Paul R. Thompson testified in effect that shortly after the shooting at the bridge, he saw a man whom he could not identify "running towards the creek" turn out of the road just above Mrs. Ergle's home.

In the presence of the jury the acetylene tank and the oxygen tank which were found buried in the ground were connected up with the cutting torch and a steel bar was cut in two. According to the testimony of T. O. Sturdivant, several of the articles found buried in the ground, as stated, and several of those found in the Studebaker automobile and the Oldsmobile were suitable for being used in "cracking safes." There was no testimony that any witness ever saw the automobile in which the defendant says he and his friend were hauling whisky, or any whisky they were hauling, or said friend. Near the place where the tanks and other articles were unearthed, there were found, shortly after the arrest of defendants, bundles containing charter, checks, deeds, mortgages, liberty bonds, jewelry, and currency which had been unlawfully taken from the Bank of Ila, on February 4, 1935. At the same time and place were unearthed bundles containing bank charter, checks, deeds, papers, etc. which had been taken from the Bank of Hillsboro by burglars on April 22, 1934. The safes of these banks had been entered by being burned into with a blow torch, and there was evidence to the effect that the defendants were seen near Ila shortly before that bank was burglarized, and that they claimed to be selling rugs. The jury had before it a map showing the roads, houses, etc. in and about the place where said articles were buried.

This court has already affirmed the conviction of George Brunson's co-defendant, George Gray, for the identical crime charged against Brunson, Gray and Miller. See *Gray* v. *State*, 52 *Ga.*

*App.* 209 (182 S. E. 824). While the evidence against Brunson is not so strong as that against Gray for the reason that Brunson was not caught in the actual possession of any of the articles mentioned in the indictment, a careful study of the brief of evidence satisfies us that the evidence connects Brunson with the crime and shows his guilt to the exclusion of every other reasonable hypothesis save that of the guilt of the accused. Most of the numerous grounds of the amendment to the motion for new trial present objections to evidence based on one or more of the following grounds: (a) the defendant is not shown by the evidence to have been in any way connected with the transaction or matter in question; (b) the evidence relates to crimes that are entirely separate and distinct from the one with which the defendant is charged; (c) the evidence puts the defendant's character in issue. The last ground avers that the court erred in charging the law of conspiracy for the reason that there was no evidence to support the charge, though "the charge as an abstract principle of law was correct." Our view is that none of the grounds of the amendment to the motion for new trial discloses reversible error. In conclusion we will state that the following ruling in the companion case of *Gray* v. *State,* supra, bears directly on several of the grounds of the amendment to the motion for new trial in the instant case: "Evidence as to offenses or acts other than the particular crime charged in the indictment is admissible when it tends to connect the accused with the crime charged, or tends to show his course of conduct, motive, or intent, or a common scheme or plan or related offenses. *Chappell* v. *State,* 40 *Ga. App.* 502 (150 S. E. 450), and cit.; *Frank* v. *State,* 141 *Ga.* 243 (2-*b, c*) (80 S. E. 1016). Under this ruling and the facts of the instant case, the admission of the evidence complained of was not error for any reason assigned."

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*