31384. SOUTHEASTERN AIR SERVICES INC. *v.*
EDWARDS.

31385. SOUTHEASTERN AIR SERVICES INC. *v.*
HEINZ *et al.*

DECIDED NOVEMBER 15, 1946. REHEARING DENIED DECEMBER 4, 1946.

*Smith, Partridge, Field & Doremus,* for plaintiff in error.

*Lindley W. Camp,* for Edwards.

*Candler, Cox & McClain,* for Heinz *et al.*

FELTON, J. The evidence showed substantially the following facts: The plaintiffs' planes were destroyed by fire about nine o'clock one morning. At the time there were approximately twenty planes in the defendant's hangar, twelve of which were owned by the defendant. The plaintiffs' planes were stored in the hangar for hire. The hangar was filled with airplanes. On this occasion the planes were arranged in the hangar so that the wing of a Stinson plane extended over the fuselage of a Cessna plane. Both planes were covered with highly inflammable fabric and varnish. A new radio transmitter had been installed in the Cessna plane the day before the fire. The antenna extended from a post above the cabin and back to a fixed vertical stabilizer. The antenna was about eight to twelve inches above the fabric of the plane near the top of the cabin and about three feet above it at the tail of the plane. The antenna of the Cessna was near the wing of the Stinson. It was estimated by at least one witness that the distance from the fuselage of the Cessna to the overlapping wing of the Stinson was three feet, and that the antenna of the Cessna extended three feet above the body of the Cessna. No one knew exactly how near the antenna was to the overlapping wing. An employee of the defendant was testing the transmitter of the Cessna at the time of the fire. When the fire was first observed, it was in the wing of the Stinson and fuselage of the Cessna. No one knew where or how it started. It was seconds after the generator of the radio set in the Cessna started when the fire was first seen, according to one witness. A witness who had a license to install and repair radio antennæ testified: That he had tested airplane radios outside of hangars, and he knew that was the way it was done; that he had tested radios outside of hangars because a high voltage was used on the transmitter antenna; and that, if it touched anything, it would burn it. J. W. Weaver, the defendant's manager, testified in part as follows: That they were checking the radio to see if they could talk to the control tower; that as they called a second time, an assistant called "fire;" that when he got out, the entire fuselage of

the Cessna was on fire and so was the Stinson wing above it; that he had tested transmitters in hangars before and had never had any bad results from it; that the radio in the Cessna put out twenty to thirty watts; that there was no welding or blow-torch operation going on around there that morning, nor extension electric light nor cigarette smoking that he knew about; that the radio technician told him what to do; that when you turn the switch, the dynamo starts; that he didn't realize there was any danger; that he did know it at the time of this testimony; that he couldn't say a spark from the antenna caused the fire, but he couldn't say what else caused it; that it was from two to four or five minutes after he pushed the radio button when he was warned of the fire; that he checked the radio the night before when the aircraft were parked as they were the day of the fire; that he never did see any sparks come from the aerial when he tested the radio; that he had touched a small transmitter, ten or fifteen watts, the results of which was a stinging sensation. The defendant's maintenance mechanic testified: That transmitting antennæ threw sparks out when being tested, and if they struck inflammable material, that was grounded they would spark, and that the Stinson plane was grounded, in his opinion; and that you could take a lead pencil and put it on the posts and it would arc and burn you if you touched it. Another witness testified that the Stinson wing was about twelve inches over the Cessna fin, and that in his opinion a spark would jump from the aerial of the Cessna to the wing of the Stinson, if the transmitter of the Cessna was operated and the Stinson was grounded. He stated that the aerial would have to be as close as one-sixteenth of an inch to the wing for a spark to jump. There was a great deal of evidence on the question of the sufficiency of the fire-fighting equipment, but it was inconclusive so far as the specific negligence charged is concerned. There was testimony that a forty-gallon extinguisher on wheels was not used because it could not be made accessible on account of the crowded condition of the hangar. There was evidence that another extinguisher was not used because the person endeavoring to operate it did not know how to operate it and did not pull the safety pin, etc. There was evidence also that the defendant corporation had its own planes insured against fire.

There are only two grounds of negligence alleged: (1) test-

ing the radio of the Cessna when the wing of the Stinson was so close to it as to cause a fire when the radio was operated; and (2) the failure to equip the hangar with extinguishers which were filled with fluid or would work. Since the evidence showed that the extinguisher which one of the employees attempted to use failed to extinguish the fire, for the reason that the person attempting to use it did not know how to operate it, and that the forty-gallon extinguisher was not used because it could not be made available on account of the crowded hangar, it is evident that the failure to have extinguishers filled with fluid was not a factor contributing to the failure to extinguish the fire. Therefore no recovery could be based solely on this ground of negligence.

However, the evidence did authorize a finding that the defendant was guilty of negligence in the first particular set forth above, and a finding that the defendant was negligent in testing the radio under the conditions shown, thereby starting the fire. A finding of negligence in this respect was sufficient to authorize a recovery, as it would not be necessary for the plaintiff to go further and show that the defendant was further negligent in not putting out a fire which had been caused by its negligence. The case would be otherwise, so far as not having taken precautions to extinguish a fire is concerned, if the fire had originated from causes other than the defendant's negligence. We do not think that the fact that the defendant's manager had tested the radio the night before under the same conditions and circumstances as on the day of the fire would demand a finding that the defendant exercised ordinary care. In fact this witness virtually admitted in his testimony that he should have known better. The contention that the defendant exercised ordinary care, because it exercised the same care as to the plaintiffs' planes as it did as to its own, is unsound for two reasons: first, because the defendant had its planes insured against fire, while it did not have the plaintiffs' planes so insured; and second, because ordinary care is not what any particular person does under given circumstances, but what the ordinarily prudent person does. Code, § 105-201. "In all cases of bailment, after proof of loss the burden of proof is on the bailee to show proper diligence." § 12-104. "Depositories for hire are bound to exercise ordinary care and diligence, and are liable as in other cases of bailment for hire." § 12-404. The judge, trying the case with-

out a jury, was authorized to find that the defendant did not exercise ordinary care in respect to the first specification stated above. The only plausible explanation of the cause of the fire is that the radio test, under the circumstances, caused it.

■ The oral announcement by the judge was not a judgment finding that the defendant was negligent solely in a particular not alleged or proved. *McRae* v. *Smith,* 164 *Ga.* 24 (137 S. E. 390); *Sims* v. *Boyd,* 177 *Ga.* 465 (170 S. E. 375); *Frank* v. *State,* 141 *Ga.* 243 (19) (80 S. E. 1016); Code, § 110-302; *Duke* v. *State,* 13 *Ga. App.* 709 (79 S. E. 861); *Easterling* v. *State,* 11 *Ga. App.* 134 (74 S. E. 899); *N. C. & St. L. Ry. Co.* v. *Brown,* 3 *Ga. App.* 561 (60 S. E. 319); *Rutland* v. *State,* 14 *Ga. App.* 746 (82 S. E. 293); *Jackson* v. *State,* 15 *Ga. App.* 179 (82 S. E. 771). The judgment signed by the judge was a general finding not based on any particular specification of negligence alleged, and could have been based on a ground of negligence not referred to in his statement. The fact that he stated that he did not know what caused the fire did not necessarily mean that he did not think that the most plausible and reasonable explanation was the negligence of the defendant in testing the radio under the circumstances shown by the evidence. *Red-Cross Laundry* v. *Tuten,* 31 *Ga. App.* 689 (121 S. E. 865). The ruling in *Davis* v. *Zaban Storage Co.,* 59 *Ga. App.* 474 (1 S. E. 2d, 473), does not mean that in every case where the exact and definite cause of a loss is unknown the bailee is not to be held liable. That case simply rules that the bailee is not liable where the cause of the fire is unknown and the evidence shows that the bailee exercised ordinary care.

■ The plaintiff in error (the defendant below) contends that the evidence in case No. 31385 is insufficient to sustain the amount found as the value of the property. One of the plaintiffs testified as follows: "On July 20, Mr. H. C. Heinz Jr. and I had a Lasiter-Kauffman sailplane. . . The value of that plane was at least $800. I arrive at that value by the cost of replacement of the aircraft, also by the cost of the original aircraft plus certain expenses of obtaining a license for it. . . All the expenses incurred in making it licensable to fly as a civil aircraft. . . We had paid the storage charges in the amount of $20 a month. . . The mechanic's fee was $40, the parts and materials, $30, and the necessary time and storage involved was around $60. . . I pur-

chased my first aircraft on bids through a Government agency. I think it was the Reconstruction Finance Corporation. We endeavored to purchase another plane from them, but they were not available. At that time they gave $600 as the list price on an aircraft . . but they were unable to supply one because they were all sold. If I had replaced that glider on that date through the Government agency, it would have cost $600 plus the aforementioned expenses of getting a license as a civil aircraft, which would be a total of approximately $800. . . My partner . . and I paid $429 for this glider . . that one that burned up. I bought another for . . $500. . . 'I purchased the . . glider in Americus, Georgia. As to how I got the glider to Atlanta, we made one trip down there to inspect the glider and return, and then at a later date we bid on the aircraft and were successful in purchasing it, and we made a second trip down there to bring it back. . . The Reconstruction Finance Corporation, I understand, the policy is to allow twenty-seven cents a mile transportation for ferrying aircraft. I should say, at least $75, possibly more. I think it is 140 miles from Atlanta to Americus. That would be 280 miles at twenty-seven cents. I would say Mr. Heinz and I together spent $75, possibly more, on those trips, on the two trips. At the time of the fire I couldn't buy one in Atlanta, and when I purchased my second glider I had to go to Chattanooga, Tennessee, 125 miles, about. . . I could not say the approximate cost of that trip to me. I seriously doubt that it would be any less than twenty-seven cents a mile."

The measure of damages for a loss such as we have in this case is, generally, the market value of the destroyed property at the time of its destruction. This rule is applied unless it is shown that the property had no market value (*Cherry* v. *McCutchen, 65 Ga. App.* 301, 16 S. E. 2d, 167), or the actual loss to the owner is sought and established by another method which more nearly arrives at the loss to the owner. *Burke County* v. *Renfroe, 64 Ga. App.* 395 (13 S. E. 2d, 194). In this case the evidence does neither. No market value is shown. See *Peninsular Naval Stores Co.* v. *State, 20 Ga. App.* 501 (93 S. E. 159). The fact that there was no market value is not shown, and some of the factors presented to show the actual loss are not relevant on the question. For instance, Reconstruction Finance Corporation's list price of $600, which the

court evidently accepted, does not establish market value or cost of replacement when Reconstruction Finance Corporation did not have gliders for sale at that price. See *Watson & Powers* v. *Loughran*, 112 *Ga.* 837, 841 (38 S. E. 82) ; *Coffee* v. *Worsham & Weaver*, 31 *Ga. App.* 62, 64 (119 S. E. 665) ; *Aircraft Apartments Inc.* v. *Haverty Furniture Co.*, 71 *Ga. App.* 560 (31 S. E. 2d, 419). The cost of trips to Americus to inspect would not be an item of the cost of the glider, nor would the cost of storing the glider. The cost of transporting the glider to Atlanta would be relevant in determining the market value, as would the cost of putting the glider in flying condition. The evidence in this case does not authorize the verdict for $800, and for this reason the case must be reversed. The court also erred in admitting in evidence the government's valuation of the glider at $2618.76 on May 19, 1943. The judge was trying the case without a jury and probably was not influenced by the evidence, but this evidence was wholly without probative value. For the reasons stated in this division of the opinion, the court erred in overruling the motion for a new trial in case No. 31385.

The court did not err in overruling the motion for a new trial in case No. 31384, for the reasons stated in the first two divisions of this opinion.

*Judgment affirmed in case No. 31384. Judgment reversed in case No. 31385. Sutton, P. J., and Parker, J. concur.*